UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

AMANDA I. DOWDELL,

        Plaintiff,

    v.                                **Civil Action 2:19-cv-1430**
                                       **Judge George C. Smith**
COMMISSIONER OF SOCIAL        **Magistrate Judge Chelsey M. Vascura**
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Amanda I. Dowdell ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income benefits. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 16). For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.      BACKGROUND

Plaintiff filed her application for Title XVI Supplemental Security Income Benefits on March 25, 2015, alleging that she had been disabled since June 10, 2012. (R. 298.) On October 17, 2017, following administrative denials of Plaintiff's application initially and on reconsideration, a hearing was held before Administrative Law Judge Matthew Winfrey (the "ALJ"). (*Id.* at 58–82.) Plaintiff, represented by counsel, appeared and testified. Vocational

expert Carl Hurtung (the "VE") also appeared and testified at the hearing.  On April 12, 2018, the ALJ issued a decision denying benefits.  (*Id.* at 152–73.)  However, on June 4, 2018, the Appeals Council vacated that decision and remanded the case to address discrepancies in the ALJ's residual functional capacity ("RFC")[1] and the hypothetical RFC actually posed to the VE at the October 17, 2017 hearing, and to clarify the weight given to a medical consultant's opinion.  (R. 176–77.)  Accordingly, a second hearing was held before the same ALJ on November 8, 2018.  (*Id.* at 83–117.)  Plaintiff, represented by counsel, appeared and testified.  VE Brian Womer, M.S., and Medical Expert ("ME") Michael Lace, Psy.D., also appeared and testified at the hearing.  On November 30, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.* at 36–51.)  On February 14, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. 1–4.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

In her Statement of Errors (ECF No. 9), Plaintiff represents that her sole contention of error is that the ALJ failed to properly evaluate the mental health evidence of record.  However, from review of the Statement of Errors as a whole, it appears Plaintiff's real contention of error is that the ALJ erred in weighing the mental health opinion evidence.

## II.     RELEVANT RECORD EVIDENCE

The ALJ's decision summarized the following mental health evidence of record.

---

[1] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).

**A.      Mental Health Symptoms**

**1.      Plaintiff's Reports and Testimony**

In March 2015, Plaintiff reported in her application for Supplemental Security Income Benefits that she suffered from anxiety, multiple personality disorder, depression, and adjustment disorder.  (R. 43, 340).  In April 2015, she reported as part of her benefits application that mental illness limited her ability to stay at work because she worried about things happening outside of work that she could be taking care of.  (R. 43, 348.)  In August 2015, she further reported that, because of her pregnancy, she was unable to take multiple medications that she needed.  (R. 43–44, 365.)  In December 2015, she reported that she had posttraumatic stress disorder and was more distrustful and stressed due to her children being molested while in foster care.  (R. 44, 370.)

At the October 2017 hearing, Plaintiff testified she last worked in September 2017 and stopped because she had an altercation with a customer and had a breakdown over her daughter. She said that she could no longer be hired because she was not reliable.  She further testified that she could not work because she could not deal with losing her children and could not stop thinking about them.  Plaintiff said that, when she took her medication, she slept for 12 hours and awakened feeling disoriented.  (R. 68.)  Yet, she later said that her medications did not help her sleep.  (R.71.)  Plaintiff indicated that she became overwhelmed going to the store and was overwhelmed seeing people who knew about her children or who knew her.  She also said that it was hard for her to concentrate on television or a magazine, adding that she could concentrate on something small but not if it was something important.   Plaintiff stated that she had anxiety/panic attacks if there were too many people in a store and that her panic attacks lasted 2 to 45 minutes depending on what was going on in her life.  She added that being out of control and not being able to accomplish anything upset her.  (R. 44, 63–75.)

At the November 2018 hearing, Plaintiff testified that she had a fear of the unknown and was unable to control her emotions.  She said that she stopped taking medication because she was sleeping all day and added that she was now only on Prozac and did not experience any significant side effects from this medication.  Plaintiff testified that she was "pretty good" at multitasking.  She said that her life currently revolved around trying to get custody of her children and also that she was in the process of divorcing her husband, who was abusive.  Plaintiff admitted that she continued to use marijuana, which she obtained from friends.  She said that work overwhelmed her and that she was unable to concentrate.  (R. 44, 88–97.)

### 2.    Treatment Notes and Evaluations

In October 2014, Plaintiff was treated in an emergency room for injuries from a domestic dispute, but she was alert and fully oriented, and she had a normal mood and affect. (R. 44, 543.)

A February 2015 mental status exam by Plaintiff's treating mental health counselor demonstrated restlessness and depressive affect and mood, but her intellectual functioning was not remarkable, and her memory was intact.  Plaintiff presented with no suicidal/homicidal ideation and no signs or symptoms of a formal thought disorder.  She was alert, attentive, and maintained good eye contact.  Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood, mood disorder NOS (not otherwise specified), personality disorder, and cannabis abuse.  Plaintiff displayed no psychotic thoughts, her memory was not impaired, and her attention and concentration were within normal limits.  Her affect included some tearfulness.  (R. 44–45, 425–33.)

In March 2015, Plaintiff was treated in an emergency room for dizziness and emesis, but presented with normal mood, affect, behavior, judgment, and thought content.  (R. 45, 465.)

In June 2015, psychologist Steven Meyer, Ph.D., performed a consultative examination and diagnosed Plaintiff with adjustment disorder with depression and anxiety and personality

4

disorder. Plaintiff was noted to be clean but unkempt. She displayed good eye contact was good and normal expressiveness with no flight of ideas or poverty of speech. Plaintiff's thought processes were well organized. Her affect was constricted and mood mildly dysphoric and anxious. Plaintiff endorsed symptoms of depression but denied suicidal ideation. She displayed overt signs of anxiety, such as fidgetiness, but no symptoms or signs of a formal thought disorder. Plaintiff denied feeling traumatized by negative life events. She was able to understand simple and moderately complex instructions. She repeated five digits forward and five in reverse. Plaintiff's short-term memory was estimated to be below average, but she was able to interpret proverbs, and her long-term memory was average. Plaintiff's concentration was good, and her persistence and pace were average. (R. 45, 539–44.)

In August 2015, Plaintiff represented to her counselor that things were going "good" and that she was feeling better. Plaintiff was observed to be alert, attentive, and cooperative, and she maintained good eye contact and actively participated in the therapy session. Plaintiff's affect was described as pleasant and her mood congruent. (R. 45, 548.)

From December 22, 2015, through April 18, 2016, Plaintiff attended counseling sessions and was noted to have normal speech with no looseness of associations or abnormal thought processes, including no hallucinations or delusions. Plaintiff displayed intact memory with no impairment in concentration and attention, though her affect was tearful at times. She was diagnosed with major depressive disorder, anxiety disorder NOS (not otherwise specified), and cannabis dependence. (R. 45, 657–65.)

In April and May 2016, while being treated for various minor physical issues, Plaintiff displayed a normal mood, affect, and behavior. (R. 45, 1108, 1114, 1118.)

A June 2016 counseling note indicated that Plaintiff was feeling better. She was alert and attentive and maintained good eye contact. Her affect was constricted but appropriate, and her mood was congruent. (R. 45, 545.)

In November 2016, laboratory tests ordered after Plaintiff attended the emergency room for headache pain were positive for cocaine and marijuana. Plaintiff presented with full orientation and a normal affect. (R. 45, 931, 936.)

In December 2016, emergency room treatment records for lower back pain, headache, vomiting, and fatigue document that Plaintiff displayed a normal mood, affect, behavior, and thought content. (R. 45, 1241.)

A January 2017 depression screening by a primary care physician demonstrated minimal depression, and she again displayed a normal mood, affect, behavior, judgment, and thought content. (R. 45, 951.)

However, later in January 2017, Plaintiff presented at an emergency room with suicidal ideation due to trouble keeping custody of her children. A toxicology report was positive for cocaine and marijuana, and Plaintiff reported of auditory and visual hallucinations for the past couple of days, though she later denied hallucinations. (R. 45, 1246, 1253–54.) On a mental status exam, her eye contact was poor, but she was cooperative and spontaneous. There were no observed psychomotor abnormalities. Plaintiff's speech was normal, her mood depressed, and her affect constricted. Plaintiff's thought process was goal directed with no loosening of associations, and her attention and concentration were intact. Her recent and remote memory was also intact, and her intelligence was estimated as average. Plaintiff's diagnoses were adjustment disorder with mixed emotions and polysubstance dependence. (R. 45, 1255.) She

was admitted to the hospital for observation, but she denied suicidal ideation and was discharged the following day.  (R. 45, 1256.)

An April 2017 depression screening by a primary care physician was negative.  (R. 46, 970.)

In May 2017, Plaintiff stated to a mental health counselor that she was trying to get back custody of her daughter and was trying to get clean from drugs.  (R. 46, 988.)  She represented that she did not have suicidal ideation.  Plaintiff's diagnoses were disruptive mood dysregulation disorder, adjustment disorder with anxiety, borderline personality disorder, and cocaine use with unspecified cocaine-induced disorder.  (R. 46, 995.)

In September 2017, Plaintiff reported to her mental health counselor continuing anxiety and loss of interest since losing custody of her children, but she denied suicidal ideation and reported that her boss at Burger King was very lenient about her missing work.  She also admitted to running around with "bad people on drugs."  (R. 46, 1291.)

In October 2017, Plaintiff reported to a primary care physician that she felt depressed and anxious but denied suicidal ideation, hallucinations, and medication side effects.  On mental status exam, she was casually dressed, cooperative, and spontaneous.  Her eye contact was good, and she was alert and oriented times three with no psychomotor abnormality.  Plaintiff's gait was steady, her speech normal, and her affect constricted and tearful but without abnormal thought content.  Plaintiff's thought process was goal directed with no loosening of association, and her concentration and attention were intact.  Plaintiff was diagnosed with major depressive disorder and polysubstance dependence, and her medications were adjusted.  (R. 46, 1331–32.)

In November 2017, Plaintiff presented to her treating social worker as anxious and crying, but she displayed appropriate behavior, good eye contact, normal and pressured speech,

concrete thought process, alertness, and fair insight and judgment, with no suicidal ideation. (R. 46, 1433.) She had similar mental status exam findings near the end of the month, and she had intact recent and remote memory. (R. 46, 1435–36.) In December 2017, Plaintiff reported daily marijuana use and had an anxious and sad mood, but otherwise substantially normal mental status functioning. (R. 46, 1438.)

In January 2018, Plaintiff reported to her psychiatrist that she was having frequent nightmares but denied suicidal ideation, hallucinations, and delusions. She had a depressed mood and constricted and tearful affect, but otherwise normal mental status functioning. (R. 46, 1440.)

In February 2018, Plaintiff presented to the emergency department with deliberate self-cutting behavior, stating she thought it would make her feel better. She denied suicidal ideation and hallucinations, though she reported using marijuana daily. A physical exam revealed multiple superficial abrasions on both distal forearms but no gaping lacerations or active bleeding. Plaintiff's mood was anxious, but her speech normal. She was cooperative and not agitated, aggressive, or combative. She was prescribed medication to treat anxiety. Plaintiff stated that "her lawyer recently told her that is (sic) she has any [history] of cutting or current episodes that she needs it documented so they can put it in her court case." She further noted that she was too stressed to work, adding that "getting a job would also hurt her chances of getting her [Social Security Disability Benefits] as well." Plaintiff's toxicology results were positive for marijuana but not cocaine. (R. 46, 1345–49, 1353.)

In early March 2018, Plaintiff's treating social worker noted she displayed an anxious and irritable mood but otherwise normal mental status findings. (R. 46, 1449.) On March 30

and April 1, 2018, Plaintiff was fully oriented and had a normal mood and affect at two emergency department visits. (R. 46, 1388, 1396.)

A June 2018 depression screening by a primary care provider indicated depression. (R. 46, 1491.)

In mid-July 2018, Plaintiff told her treating social worker that she had not attended counselling because she had been working about four hours weekly for two months. (R. 46, 1494.)

In late July 2018, Plaintiff reported to her psychiatrist that she was not doing well and was very irritable after not taking any medication for a few months. Plaintiff had normal mental status exam findings except for a stressed mood and constricted affect. Her attitude was cooperative. (R. 46, 1473–74.)

An August 2018 depression screening with her primary care physician indicated no depression. (R. 46, 1501).

In early September 2018, Plaintiff brought her boyfriend to a therapy session with her treating social worker. Plaintiff was loud and disruptive in the session, screaming and using profanity at her boyfriend. (R. 46–47, 1504.)

In late September 2018, Plaintiff reported to her primary care physician that she had anger issues and was feeling depressed, but that she had no manic symptoms, suicidal thoughts, or side effects from medications. Her attitude was cooperative. (R. 47, 1507–08.)

## B.    Activities of Daily Living

In April 2015, Plaintiff completed a function report stating that she drove all day to "find money," cleaned, took care of her personal needs, prepared quick meals, swept, did laundry, washed dishes, shopped, and socialized 2 to 3 times per month. She reported that she had no problem with personal care, but did require reminders to take care of her personal needs and

grooming and to take her medicine.  She reported that she could count change, handle a savings

account, and use a checkbook, but did not have money to pay bills.  Plaintiff endorsed difficulty

maintaining attention and handling stress, but acknowledged that she could satisfactorily follow

instructions and handle changes in routine.  (R. 42, 349–55.)

During a consultative examination with Dr. Stephen Meyer in June 2015, Plaintiff

reported spending a "good part of the day" on YouTube and Facebook.  She stated that she talks

with her mother on the phone a couple times per week and sees her once per month.  Plaintiff

reported doing her own cleaning, cooking, and shopping.  (R. 42, 541.)

At the October 2017 hearing, Plaintiff testified that her activities of daily living included

driving twice a week, grocery shopping once a month, watching television, washing dishes,

doing laundry, reading, occasionally taking out the trash, and talking with her mother.  (R. 42,

63, 69, 71, 73, 75.)

At the November 2018 hearing, Plaintiff testified that her activities of daily living

included grocery shopping once a month, watching television, using Facebook to interact with

friends, washing dishes, folding laundry, and cooking.  She said she had no problems with self-

care and was "pretty good" at multitasking.  She further stated that she had two or three good

friends and that a friend might call or stop by; however, sometimes she would come up with an

excuse not to see her friends.  Plaintiff's hobbies included coloring, Yahtzee, and watching

movies.  (R. 42, 93–99.)

### III.     THE ALJ'S DECISION

On November 30, 2018, the ALJ issued a decision finding again that Plaintiff was not

disabled within the meaning of the Social Security Act.  (R. 36–51.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date March 21, 2015. (*Id.* at 38.) At step two, the ALJ found that Plaintiff has the severe impairments of morbid obesity, substance abuse disorder, and affective, anxiety, and personality-related disorders. (*Id.*) He further found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 41–43.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> The claimant has the residual functional capacity (RFC) to perform medium work as defined in 20 CFR 416.967(c). She can perform work that is not at a production rate pace, such as with assembly line work. She can perform routine tasks with occasional changes in tasks or the workplace. She must not engage in work-related travel or commercial driving. Her job duties must not include conflict resolution, evaluation of others, or persuasion of others. She must have no contact with illegal substances.

(*Id.* at 43.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step five of the sequential process, the ALJ, relying on the VE Womer's testimony, found that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (*Id.* at 51.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits

or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.     ANALYSIS

Plaintiff's sole contention of error is that the ALJ failed to properly weigh the mental health evidence of record in arriving at Plaintiff's RFC. The undersigned will address the evidence supporting the ALJ's RFC, as well as each of the mental health opinions that Plaintiff contends were not afforded sufficient weight by the ALJ, in turn.

### A.     The ALJ's RFC was supported by substantial evidence.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1); *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.").

The ALJ is charged with the final responsibility for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). Moreover, the Social Security Act and agency regulations require an ALJ to determine a claimant's residual functional capacity based on the evidence as a whole. 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i) (incorporating § 423(d) for Title XVI); 20 C.F.R. § 404.1545(a) ("the ALJ . . . is responsible for assessing your residual functional capacity"). As the court recognized in *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222 (N.D. Ohio March 2, 2010), the ALJ is charged with

evaluating several factors in determining the residual functional capacity, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *Id.* at *2 (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); Social Security Ruling 96-5p; Social Security Ruling 96-8p).

An ALJ's residual functional capacity assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant non-medical evidence regarding what work a claimant is capable of performing. Social Security Ruling 96-5p. Social Security Ruling 96-8p instructs that the ALJ's residual functional capacity assessment must be based on all of the relevant evidence in the case record, including factors such as medical history, medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, and evidence from attempts to work. Social Security Ruling 96-8p.

The applicable regulations also explain that "[a]lthough we consider opinions from medical sources on issues such as . . . your residual functional capacity, . . . the final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2). The regulations do not require an ALJ to rely solely upon medical opinions when formulating a residual functional capacity, but instead explicitly require an ALJ to evaluate medical opinions based on their consistency with and support from "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2), (3), (4). Indeed, as the Sixth Circuit has held, physician opinions "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994).

In this case, the ALJ's weighing of the mental health opinions in arriving at Plaintiff's

RFC is supported by substantial evidence.  In crafting the RFC, the ALJ assigned "significant

weight" to the opinion of Dr. Michael Lace, Psy.D., the Medical Expert who testified at the 2018

hearing.  (Hearing Transcript, R. 103–11.)  The ALJ observed that Dr. Lace is a certified in

clinical psychology and has specialized knowledge of the SSA program.  The ALJ further noted

that Dr. Lace "listened to the testimony of the claimant, summarized the record, noted many

normal mental status exam findings, suggested that cocaine abuse could cause the claimant's

anxiety, and concluded that the claimant would need slow-paced routine tasks and would need to

avoid illegal substances."  (ALJ Decision, R. 47.)  The ALJ further explained that he found Dr.

Lace's opinions to be "based on a longitudinal perspective of [Plaintiff's] condition" and

"consistent with and supported by the objective clinical findings in the record."  (*Id*.)  Of note,

the ALJ directly adopted the following limitations directly from Dr. Lace's testimony: Plaintiff

can perform work that is not at a production-rate pace; she can perform routine tasks with

occasional changes; she must not engage in work-related travel or commercial driving; and she

must have no contact with illegal substances.  (*See* ALJ Decision, R. 48; Lace Testimony, R.

107–08.)  Thus, Dr. Lace's opinion constitutes substantial evidence for these limitations in the

ALJ's RFC.  *See Swett v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 656, 661 (S.D. Ohio 2012) ("A

medical expert's opinion, based on a review of the complete case record, can constitute

substantial evidence.") (citing *Blakley,* 581 F.3d at 408–09).

The ALJ did not rely solely on Dr. Lace's opinion, however.  Indeed, the ALJ's mental

RFC was *more* restrictive than Dr. Lace opined.  Rather, in formulating Plaintiff's RFC, the ALJ

also considered Plaintiff's testimony, her treatment records, and her activities of daily living

(*See* ALJ Decision, R. 42, 44 (discussing Plaintiff's ADLs); R. 44 (discussing Plaintiff's

testimony); R. 44-47 (discussing Plaintiff's treatment records and concluding that the "longitudinal record documents generally normal or relatively normal mental status functioning, even during periods of heightened mental symptomatology"). The ALJ acknowledged that "high stress and intense interactions aggravate [Plaintiff's] symptoms," as well as her "difficulty responding appropriately to intense interpersonal interactions" and proceeded to explain which particular limitations were included in the RFC to accommodate these findings. The ALJ also considered the opinions of the state agency reviewers (Dr. Cynthia Waggoner, Psy.D., and Dr. Karen Terry, Ph.D.) in formulating Plaintiff's mental RFC. Indeed, the ALJ included several of their opined non-exertional limitations in the RFC he assessed—that Plaintiff's job duties must not include conflict resolution, evaluation of others, or persuasion of others. (*See* ALJ Decision, R. 48; Dr. Waggoner's Opinions, R. 131–32; Dr. Terry's Opinions, R. 147.) The state agency reviewers' opinions also constitute substantial evidence in support of the ALJ's RFC determination. *See*, *e.g.*, *Burton v. Comm'r of Soc. Sec.*, 690 F. App'x 398, 401 (6th Cir. 2017) (holding an ALJ's opinion relying on state agency reviewers' opinions was supported by substantial evidence).

In spite of this substantial evidence supporting the ALJ's mental RFC, Plaintiff argues that the ALJ should have included additional limitations opined by various sources. The Court will consider each of the mental health opinions that Plaintiff contends were not afforded sufficient weight by the ALJ.

## B.      Kelly Brannon, LISW, Plaintiff's Treating Social Worker

Plaintiff argues that the ALJ should have credited the opinions of her treating social worker, Kelly Brannon, LISW. Ms. Brannon completed a medical source statement regarding Ms. Dowdell's mental state on August 14, 2018. (R. 1482–83.) Ms. Brannon found that Plaintiff was seriously limited in several functional areas including maintaining attention,

sustaining an ordinary routine, making simple work-related decisions, and responding appropriately to changes in a routine work setting. (R. 1482.) Ms. Brannon also found that Plaintiff was unable to meet competitive standards in completing a normal workday or week, asking simple questions, accepting instructions and responding appropriately to criticism from supervisors, and dealing with stress. (*Id.*) Ms. Brannon explained that Plaintiff is impatient and has no tolerance for others. She went on to note that Plaintiff has a quick temper, poor social skills, and acts on impulse. (*Id.*) Ms. Brannon also opined that Plaintiff would miss more than four days of work per month. (R. 1483.)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(b). The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1).

Social workers like Ms. Brannon, however, are not "acceptable medical sources" and instead fall into the category of "other sources." 20 C.F.R. §§ 404.1513(d), 416.913(d). Although the ALJ must consider opinions from "other sources" and "generally should explain the weight given," "other-source opinions are not entitled to any special deference." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (citation omitted); *see also Cole v. Astrue*, 661 F.3d 931, 938 n.4 (6th Cir. 2011) (noting "the importance of addressing the opinion of a mental health counselor as a valid 'other source' providing ongoing care"); 20 C.F.R. § 416.927(f)(2) (providing that the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning . . .") The ALJ

17

considers "other source" opinions using the same factors for weighing a medical opinion from an acceptable medical source, but "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source . . . depends on the particular facts in each case." 20 C.F.R. § 416.927(f)(1). The relevant factors include the examining relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source. 20 C.F.R. § 416.927(c)(1)–(6).

Here, the ALJ provided the following discussion of Ms. Brannon's opinion:

Social worker Kelly Brannon, LISW, opined that the claimant had many seriously limited mental abilities and aptitudes needed to do unskilled work, and inability to meet competitive standards, and she suggested that the claimant had no tolerance for others, poor anger management, and an inability to interact with the public without agitation (Ex. 23F). She additionally indicated that the claimant would have excessive absences from work. However, a social worker's medical opinion is not included among the acceptable sources of medical evidence defined in the regulations (20 CFR 416.927(f)). For that reason, information provided by a social worker, such as Ms. Brannon, does not equal in probative value reports from those sources shown as being acceptable such as licensed psychologists and psychiatrists. Additionally, the marked and extreme limitations suggested by Ms. Brannon's assessment are inconsistent with the above-summarized record, which documents normal or relatively unremarkable mental status findings, even during periods of more intense mental symptomatology. Accordingly, I give her assessment little weight.

(R. 49.)

The undersigned finds no error with the ALJ's consideration and weighing of Ms. Brannon's opinion. The ALJ articulated the weight he afforded the opinion and explained it was not entitled to deference because Ms. Brannon is not an "acceptable medical source," and not entitled to greater weight because it was inconsistent with the record as a whole. Substantial evidence supports the ALJ's determination. As summarized *supra*, Plaintiff's mental health assessments consistently documented depression and anxiety, but did not reflect the type of

extreme anger management problems described by Ms. Brannon.  (R. 43–47.)  Further, as the

ALJ points out, Plaintiff was able to tolerate interactions with all of her healthcare providers

without noticeable agitation.  (R. 48.)  Accordingly, the undersigned finds that the ALJ's

evaluation of Ms. Brannon's opinions are supported by substantial evidence.

## C.    Dr. Stephen Meyer, Ph.D., Consulting Examiner

Plaintiff next contends that the ALJ did not give sufficient weight to the opinions of Dr.

Stephen Meyer, Ph.D., a consulting examiner for the Ohio Division of Disability Determination.

(R. 539–44.)

Dr. Meyer performed a consultative examination of Plaintiff on June 10, 2015, after

which he diagnosed Plaintiff with an adjustment disorder with depression and anxiety as well as

a personality disorder.  (*Id.* at 542.)  Dr. Meyer opined that Plaintiff "has the cognitive capacity

to understand, remember, and carryout simple and complex instructions and tasks," "would be

expected to be able to perform adequately in a setting without strict production requirements,"

and "with considerable assistance available as needed at times of performing new tasks."  (*Id.* at

543.)  Dr. Meyer further opined that Plaintiff "would likely require a nonsocial, solitary position,

with at most intermittent contact with coworkers and supervisors."  (*Id*.)  Finally, Dr. Meyer

opined that, "if collateral information is consistent with her presentation today, [Plaintiff] would

not be able to withstand the stress of competitive work without mental health treatment and

medication and reaching stabilization."  (*Id*.)

As a non-treating practitioner, Dr. Meyer's opinion is not entitled to any particular

deference.  Consultative examiners' opinions must be meaningfully evaluated according to the

factors set forth in 20 CFR § 404.1527(c), but an ALJ need not give "an exhaustive factor-by-

factor analysis."  *Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 650 (S.D. Ohio 2015)

(quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011)).  Because a

consultative examiner usually meets with the claimant only once, they usually do not have an on-going treatment relationship with the claimant to trigger the deference owed to treating physicians. *Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 245–46 (6th Cir. 2018) (the absence of an on-going treatment relationship means "the ALJ is entitled to give less weight to the consultative examiner's opinion") (citing *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (2017)).

The ALJ provided the following discussion of Dr. Meyer's opinions:

> I give partial weight to the opinion of Dr. Meyer, who performed the above-summarized independent psychological evaluation (Ex. 7F). Dr. Meyer stated that the claimant would be able to carry out complex instructions and tasks. However, he also offered that the claimant would not be able to withstand the stress of a competitive work setting without treatment. Those two statements appear to be contradictory. He also indicated that the claimant would require a nonsocial, solitary position with at most intermittent contact with coworkers and supervisors, but the claimant was able to interact well with numerous medical and mental health sources and facilities of record, and the avoidance of conflict resolution, evaluation of others, and persuasion of others sufficiently accommodates her anger and irritability when confronted with intense, stressful, and/or adversarial interactions with others. Further, I find, based on the totality of the evidence, that her depression regarding her personal problems would preclude other than routine tasks. However, her ability to engage in daily activities, as summarized throughout this decision, and other inconsistencies in the record, show that she would be able to sustain in a work environment with only occasional changes in tasks that are not at a production rate pace, and that she could function properly within the low stress work environment those limitations entail.

(R. 48.)

The undersigned finds no error with the ALJ's consideration and weighing of Dr. Meyer's opinion. The ALJ explained he gave partial weight to Dr. Meyer's opinion because it was internally inconsistent and inconsistent with other evidence of record. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). The undersigned finds that the ALJ's determination that Dr. Meyer's opinion was largely inconsistent with the record is supported by

20

substantial evidence. For example, Dr. Meyer opined that Plaintiff could, at the time of the consultative examination, carry out complex instructions, which is inconsistent with his own opinion that she would require treatment, medication, and stabilization before she could withstand the stress of a competitive work environment. Additionally, Dr. Meyer's opined limitation of a solitary work environment is inconsistent with his opined limitation that Plaintiff would require "considerable assistance available" from coworkers and supervisors, and with the extensive record evidence that Plaintiff had no trouble interacting with her numerous healthcare providers. Further, Plaintiff's reported daily activities (such as driving, cooking, cleaning, shopping, and socializing) are inconsistent with Dr. Meyer's opined limitations that she would require a solitary position and would require medication and stabilization before she could sustain the stress of a competitive work environment. *See* 20 C.F.R. § 416.929(a) (providing that activities of daily living are one of the ways the Commissioner may evaluate a claimant's symptoms).

Finally, the ALJ did not disregard Dr. Meyer's opinions entirely; instead, he included limitations in the RFC (such as limiting Plaintiff to routine tasks with only occasional changes and precluding work at a production rate pace—which is even more restrictive than Dr. Meyer's opinion that Plaintiff could carry out complex instructions and tasks) to account for Dr. Meyer's findings that the ALJ found to be consistent with the record. Accordingly, the undersigned finds that the ALJ's evaluation of Dr. Meyer's opinions are supported by substantial evidence.

**D.     Dr. Cynthia Waggoner, Psy.D., and Dr. Karen Terry, Ph.D., State Agency Reviewers**

Finally, Plaintiff argues that the ALJ should have given greater weight to the opinions of the two state agency reviewing psychologists. At the initial level, the state agency psychologist, Dr. Cynthia Waggoner, Psy.D., opined that Plaintiff was limited to "simple tasks in situations

where a supervisor or coworker is present to explain tasks, give directions and occasionally redirect." (R 130.) She also opined that Plaintiff could "understand, remember, and sustain tasks that can be learned after a short demonstration," and could "interact occasionally in situations that do not require resolving conflicts." (*Id.* at 131.) Finally, she opined that Plaintiff "would perform best in a static work environment without strict production standards." (*Id.* at 132.) At the reconsideration level, Dr. Karen Terry, Ph.D., concurred with all of Dr. Waggoner's opinions, and also opined that Plaintiff could "interact occasionally and superficially with others in situations that do not require resolving conflicts or persuading others to follow demands," and that Plaintiff should have "[n]o contact with the general public." (*Id.* at 147.)

Like other medical source opinions, the ALJ must consider state agency medical opinions. *See* 20 C.F.R. § 416.913a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or state agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996) (administrative law judges are required to consider state agency medical "findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and Appeals Council are not bound by findings made by State agency . . . but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

The ALJ provided the following discussion of the state agency reviewers' opinions:

I give partial weight to the opinions of Dr. Waggoner and Dr. Terry in that the above-summarized record supports the need to limit the claimant to work that is not at a production rate pace, such as with assembly line work; to routine tasks with no more than occasional changes in tasks or the workplace; and to job duties that do

22

not include conflict resolution, evaluation of others, or persuasion of others. However, I did phrase the claimant's residual functional capacity in more vocationally relevant terms, and find that the other limitations suggested by Dr. Waggoner and/or Dr. Terry, such as no contact with the general public, only occasional contact with others, and the need for directions, explanations, redirection, and short demonstrations, are not necessary within the context of routine work with the above-pace limitations, only occasional changes, and avoidance of the more intense tasks of conflict resolution, evaluation of others, and persuasion of others. Rather the evidence shows that the claimant's symptomatology has been related to personal problems, such as the custody of her children and abusive relationships, but she has been able to interact appropriately around others. The record does not document an inability to function in work environments within the context of the above-identified RFC. Despite some of the evidence showing depressed mood, constricted affect, and some overt anxiety, mental status exams have generally been within normal limits. The exams have not shown any significant ongoing impairment in concentration and attention. Physical exams have also shown normal mood, affect, behavior, and thought process. There have been hallucinations reported once, but at that time the claimant had tested positive for marijuana as well as cocaine. Otherwise there have not been any signs or symptoms of hallucinations. The record documents work activity, ongoing friendships, and numerous medical and mental health treatments without difficulty interacting with providers, which supports an ability to generally interact with others within the context of the above-identified RFC that is consistent with a low stress work environment.

(R. 48).

The undersigned finds no error with the ALJ's consideration and weighing of the state agency reviewers' opinions. First, the ALJ directly adopted several of the state agency reviewers' opined limitations—namely, that Plaintiff's job duties must not include conflict resolution, evaluation of others, or persuasion of others. (*See* ALJ Decision, R. 48; Dr. Waggoner's Opinions, R. 131–32; Dr. Terry's Opinions, R. 147.) The ALJ explained he gave partial weight to Dr. Waggoner's and Dr. Terry's remaining opinions because, although the record as a whole documents some issues with concentration and attention, those issues are accommodated by the ALJ's restrictions to routine tasks that are not at a production rate pace. The ALJ also explained that any interpersonal difficulties supported by the record are

23

sufficiently addressed with the ALJ's preclusion of job duties involving conflict resolution, evaluation of others, or persuasion of others. (R. 48.)

Plaintiff takes issue with the ALJ's failure to adopt the state agency reviewers' opined limitations requiring "occasional redirection" from coworkers or supervisors. Plaintiff points out that Brian Womer, M.S., the VE at the 2018 hearing, testified that "the jobs wouldn't allow for . . . occasional redirection in the sense that . . . it would be available a third of the day. That's not really competitive work." (R. 114–15.) Plaintiff contends that the ALJ's restrictions do not sufficiently account for this need for redirection, and that, based on the VE's testimony, Plaintiff's need for occasional redirection is work-preclusive. (Pl.'s Statement of Errors 10, 13, ECF No. 9.)

The undersigned disagrees that the ALJ was required to adopt the portion of the state agency reviewers' opinion requiring occasional redirection. "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Here, the ALJ found that the record as a whole did not support a requirement of occasional redirection and that Plaintiff's concentration difficulties were accounted for by other limitations in the RFC. Indeed, the record is bereft of any treatment notes or reports or testimony by Plaintiff that she would benefit from redirection. Although substantial evidence may also support an alternative finding, the ALJ's findings were within the ALJ's permissible "zone of choice," and the Court will not re-weigh the evidence. *See Blakley*, 581 F.3d at 406; *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the

decisionmakers can go either way, without interference by the courts.") (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In sum, the undersigned finds that the ALJ's weighing of the mental health opinions is supported by substantial evidence and **RECOMMENDS** that Plaintiff's sole contention of error be **OVERRULED**.

## VI.    DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE